UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
03-CR-151 (JMR/FLN)
07-CV-4711 (JMR)

United States of America        )
                                )
         v.                     )        ORDER
                                )
Richard Ashton Oslund           )


On October 26, 2004, a jury found petitioner, Richard Ashton Oslund, guilty of robbery affecting interstate commerce, murder with a firearm during a robbery, and being a felon in possession of a firearm, pursuant to 18 U.S.C. §§ 922(g)(1), 924(c)(1)(A), (e)(1), (j)(1), and 1951.  On November 19, 2004, this Court sentenced him to 20 years' imprisonment on Count I, and to consecutive life sentences on Counts II and III.  The Eighth Circuit Court of Appeals affirmed the conviction and sentence.  United States v. Oslund, 453 F.3d 1048, 1051 (8th Cir.), cert. denied, 127 S. Ct. 750 (2006).

Oslund, pro se, moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, and for an evidentiary hearing [Docket No. 148].  Having considered all the pleadings, including Oslund's late-filed response [Docket No. 157], the Court denies the motion.  No certificate of appealability will issue.

I.  Background

On November 22, 1998, a Brinks armored truck and its driver waited in a Target store parking lot in Bloomington, Minnesota.  As Brinks employee William Strelow returned to the armored truck

carrying one bag of cash and another bag of checks, he was shot and killed and robbed by an armed robber.  The robber fled in a white car with stolen license plates.

The FBI and Bloomington police investigated jointly, interviewing approximately 39 witnesses present in the parking lot at the time of the shooting.  One witness identified the shooter as a white man in his mid-twenties, 5'10" to 5'11" in height, of average build, with dark brown hair.  Another witness described the gun as black, with a long squared-off barrel.  The firearm was never recovered.  Forensic analysis of the cartridge cases and ammunition found at the scene suggested the gun was a Glock .40 caliber pistol.

Later in 1998, Timothy Bartizal was at work in a Bloomington used car lot when he received an urgent phone call from his friend, Richard Oslund.  The two had previously met in prison.  Oslund said he needed to get rid of a car because police were looking for it.  Bartizal suggested he get it crushed at a friend's junkyard. The same day, Bartizal sold Oslund a car for $900.  Oslund paid for it with $100 bills from a wad in his pocket.  Bartizal was surprised by this, because Oslund rarely had much cash.

Later in 1998 or early 1999, Oslund was placed into custody for a parole violation.  Another of Oslund's friends from prison, Zachary Koehler, was serving time where Oslund was lodged.  Koehler observed a tattoo on Oslund's neck and asked him about it.  Koehler

2

said Oslund replied - falsely[1] - that he "had to do it after the Target." T. 471-72.[2] Koehler had heard about the robbery and asked, "What the hell happened?" Oslund answered, "Things got out of control, and I had to blast him." T. 476-77. Oslund was later transferred to another facility.

After speaking with Oslund, Koehler called his attorney, who in turn called the FBI. An FBI agent met with Koehler in April, 1999. In June, 1999, the agent arranged for Koehler to serve the final week of his sentence at the facility where Oslund was located to permit recording of conversations between them. Koehler managed to record two conversations with Oslund; one on June 16, the other on June 21, 1999. Koehler asked Oslund how to rob an armored car. Although Oslund was suspicious, he gave Koehler "hypothetical" advice that was consistent with the tactics in the Target robbery. T. 488-89.

Oslund was released from prison later in 1999. Sometime thereafter, he met with another acquaintance, Thomas Nelson. They smoked crack together. Nelson told Oslund he had been investigated as a suspect in the Brinks robbery, to which Oslund replied he knew more about the crime than Nelson thought. The robbery conversation went no further. In late September, 1999, Nelson and Oslund met

---

[1] In fact, Oslund obtained the tattoo prior to the robbery.

[2] This Order will refer to the transcripts of the trial as "T.", the motion hearing as "M.", and the sentencing as "S."

3

and smoked crack again.  Oslund told Nelson he had been desperate for cash prior to the robbery.  He described how he had shot the victim, and admitted he got "sixty, over sixty thousand in the robbery."  T. 627.  The actual amount stolen, $59,750, had never been publicly revealed.

Oslund admitted the crime to Robert Boettcher, another friend. While previously in prison, Boettcher and Oslund had discussed methods for covering up tattoos.  After Boettcher's release in early 1999, Boettcher, Oslund, and Nelson drove around Minneapolis smoking crack.  During the drive, Oslund disclosed more details about the Target robbery.  He acknowledged "scopin' out the Target" in advance, shooting the guard, and escaping in a white Grand Prix, a car similar to the eyewitnesses' descriptions.  T. 596-600.

In November, 1999, the FBI contacted Thomas Russell, another prison friend of Oslund's.  The agent enlisted Russell to cooperate in the investigation.  Russell agreed to tape record conversations.  This phase of the investigation was delayed until both Oslund and Russell were out of custody.  Russell eventually taped hundreds of hours of conversations with Oslund between August 28, 2000, and March 17, 2001.  Oslund's attorney called Russell to testify at an evidentiary hearing in an effort to determine whether the taping was voluntary.  Neither side called Russell as a witness at trial.

During the summer of 2000, Oslund and Russell visited Bartizal

4

at the used car lot.  The three smoked crack and talked in the lobby, while a mechanic named Jerome Moot was nearby in the tool room.  Moot overhead Russell ask, "Why did you shoot that guard [or guy]?"  Interested, Moot looked into the lobby and heard Oslund's answer:  "I came around the pole, and a bitch saw me, and she made a noise, and the guard was gonna turn around (or did turn around) . . . and I had to put him down."  T. 574.  These facts were consistent with eyewitnesses' descriptions of the robbery. Bartizal also heard Oslund admit he had done "that armored car job."  T. 714.

On September 24, 2000, Oslund and Russell discussed the Target robbery, and again, Oslund described it in terms consistent with eyewitness accounts.  On November 1, 2000, Russell asked Oslund how many bags he had taken from the truck, to which Oslund replied, "Two."  Oslund also told Russell that half the bags were cash and half were checks.  The ratio of cash to checks, a fact not publicly disclosed, was also consistent with the events of the robbery.

On November 22, 2000, exactly two years after the robbery, Russell drove Oslund to the scene of the crime in a car the FBI had equipped with video and sound recording devices.  On the 90-minute tape that followed, Oslund again discussed the robbery as Russell asked him questions.  Oslund's remarks indicated he had committed the crime.

On April 12, 2001, an eyewitness to the crime, Melissa Downey,

picked Oslund's photograph out of an array.   T. 923-24.  She later identified him at trial, and expressed no doubt as to her identification.   Another eyewitness, Ryan McDonald, also picked Oslund's photo from a lineup in December 2002, and later identified him at trial.  T. 358-59, 371-75.

Oslund was indicted on May 5, 2003, and went to trial in October, 2004.  At trial, Oslund's defense was that he was merely bragging about the robbery, and offered an alibi that he was at home talking on the telephone with his friend, David Heil, a ten-time felon then incarcerated in Lino Lakes, Minnesota, at the time of the shooting.  Telephone records indicated a 15-minute collect call made to Oslund's apartment from the prison at exactly the time of the robbery.  Heil testified to this conversation with Oslund, stating he specifically recalled the conversation.   On cross-examination, he admitted his memory had been refreshed by the defense investigator, and that he would help Oslund if asked.  He also acknowledged having a tattoo with the initials of the "Prison Motorcycle Brotherhood," a group whose philosophy was loyalty to one's prison brothers.

Outgoing calls from the prison were taped as a matter of course, but the tapes were retained for only two years.  Neither the government nor the defense had attempted to secure copies of the recorded calls until more than two years after the date of the robbery/killing.  The recorded conversations were no longer extant.

The jury convicted Oslund on all counts.

II.   Analysis

   A.   Oslund's Counsel Provided Effective Representation

Petitioner claims trial counsel provided constitutionally inadequate representation.  To prevail on such a claim, petitioner must show:  (a) counsel's performance was deficient, and (b) actual prejudice as a result.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To show prejudice, petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome."  Id.  Petitioner must show that counsel's deficient performance rendered the "result of the trial unreliable or the proceeding fundamentally unfair."  El-Tabech v. Hopkins, 997 F.2d 386, 389 (8th Cir. 1993).

If petitioner cannot show prejudice, the Court need not address counsel's competence.  See Williams v. United States, 452 F.3d 1009, 1014 (8th Cir. 2006).  The Court, accordingly, addresses prejudice first.  In determining whether petitioner was prejudiced by his counsel's alleged deficiencies, the Court considers the totality of the evidence before the jury.  Id. at 1013.  Where the evidence of guilt is substantial, it is difficult for a defendant to demonstrate prejudice.  See Evans v. United States, 200 F.3d 549, 551 (8th Cir. 2000).

7

1.   <u>Pre-Indictment Delay Argument was Meritless</u>

The robbery took place on November 22, 1998.  Oslund was not indicted until May 5, 2003.  During that time, the tape of David Heil's telephone call was erased by Lino Lakes prison.  Oslund claims this prejudiced his defense, and his counsel should have raised the issue of pre-indictment delay prior to trial.  The Court finds counsel's failure to do so was not ineffective, as there was no prejudice.

As an initial matter, the indictment issued well within the limitations period.[3]  <u>See</u> 18 U.S.C. §§ 3281, 3282(a).  But the fact that the indictment issued within the limitations period does not conclude the inquiry.  This is because the Due Process clause of the Fifth Amendment prohibits unreasonable pre-indictment delay. <u>United States v. Sturdy</u>, 207 F.3d 448, 451-52 (8th Cir. 2000).

To demonstrate unreasonable pre-indictment delay, a defendant must show "the delay resulted in actual and substantial prejudice to his defense, and that the government intentionally delayed the indictment to gain a tactical advantage or to harass him." <u>United States v. Sprouts</u>, 282 F.3d 1037, 1041 (8th Cir. 2002).  To establish actual prejudice, "defendant must identify witnesses or documents lost during the period of delay" that are "not available

---

[3] The violation of 18 U.S.C. § 924(j)(1) is a capital offense, and therefore has no limitations period.  18 U.S.C. § 3281.  The other violations have a five year limitations period.  18 U.S.C. § 3282(a).

through other means." Id.  If defendant cannot establish actual prejudice, the Court need not inquire into the reasons behind the delay.  Id.

Here, Oslund correctly notes the loss of the Lino Lakes prison telephone tape during the period of delay.  Yet the loss of the tape was not necessarily prejudicial.  The contents of the tape were in fact presented by other means:  Heil testified to the conversation.  There is not the slightest evidence showing Oslund's indictment was delayed in an effort to prejudice his alibi defense.  Indeed, although the government requested notice of an alibi defense in November, 2003, Oslund did not disclose his defense until three weeks before trial.  And there is no evidence the government knew of the call at all until the possible alibi came into play.

Absent evidence of actual prejudice or intentional delay, any argument about pre-indictment delay - even if timely raised - necessarily fails.  Counsel's failure to make a losing argument is not ineffective.  Strickland, 466 U.S. at 687.

### 2.  Not Calling Thomas Russell was Strategic

While Thomas Russell testified in pre-trial proceedings, neither side called him at trial.  Oslund now argues his counsel's failure to call Russell was ineffective representation, denying him his right to confrontation.

A decision against calling a witness is a "virtually

unchallengeable" matter of trial strategy. <u>United States v. Staples</u>, 410 F.3d 484, 488 (8th Cir. 2005). Defense counsel certainly knew Russell was in custody; he had him testify at an evidentiary hearing in an attempt to demonstrate the taping was involuntary. Motion T. at 124-62. At the pretrial hearing, Russell testified against Oslund without hesitation. From this, counsel could well have concluded that, once the tapes were admitted, Russell's testimony at trial might bolster, rather than undermine, their credibility. Given Russell's criminal record, counsel might have also decided his testimony was not worth the risk of jurors drawing unfavorable inferences against the party calling him. <u>Staples</u>, 410 F.3d at 489.

Such considerations make clear the decision whether to call Russell was a strategic one. Counsel's decision against calling Russell did not deprive Oslund of a fair trial.

### 3. <u>Felon in Possession Argument was Meritless</u>

Oslund argues the felon in possession charge, 18 U.S.C. § 922(g), requires proof that he possessed a specific firearm which had traveled in interstate commerce. He claims his counsel was ineffective for failing to make this argument.

Oslund is wrong. The charge of felon in possession has three elements: (1) a previous conviction of a crime punishable by imprisonment for over one year; (2) knowing possession of a firearm; (3) that was in or affected interstate commerce. <u>United</u>

10

States v. McPike, 512 F.3d 1052, 1055-56 (8th Cir. 2008).   To establish the interstate nexus, the government need only prove that the firearm was manufactured outside the state of possession. United States v. Cox, 942 F.2d 1282, 1286 (8th Cir. 1991).   The government need not produce the firearm in question.   Id.

The firearm in this case was never recovered.   An expert, however, testified that a Glock .40 caliber pistol had been used to commit the crime, and that these handguns are manufactured outside of Minnesota.   T. 441-44.   This testimony is sufficient to establish the jurisdictional nexus.   As noted, counsel is not ineffective for failing to make a losing argument.   Strickland, 466 U.S. at 687.

   B.   No Need For An Evidentiary Hearing

Oslund submits affidavits of three witnesses who did not testify at trial, and seeks an evidentiary hearing.

An evidentiary hearing is not required if (1) the movant's allegations, accepted as true, would not entitle him to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact.   Buster v. United States, 447 F.3d 1130, 1132 (8th Cir. 2006).   The Court concludes no evidentiary hearing is required in this case.

Two of Oslund's three affidavits are from criminal associates who had been interviewed by both sides prior to trial.   Neither

side opted to call them at trial.  During the investigation, Arden Archer told both sides he overheard a prison conversation between Koehler and Oslund.  In his new-submitted affidavit, Archer claims his story was a lie, and that Oslund did not in fact commit the crime.  Archer's affidavit, of course, directly contradicts his own repeated prior statements.  Such proposed testimony manifestly lacks credibility, and does not call for an evidentiary hearing.

Similarly, Douglas Pierce told investigators of his conversations with government witness Tom Nelson.  Nelson was cross-examined at trial about his statements regarding Oslund. Even if Pierce's statements are true, they provide no grounds for relief.  The third affidavit is from Shawn Wernberg, Oslund's former fiancee, who subsequently married Koehler.  She provides only conclusory statements that she and her family never believed Oslund committed the crime.  These statements do not warrant an evidentiary hearing.

Oslund also asks to be given a polygraph examination.  The Eighth Circuit has made clear that "polygraph evidence is disfavored." United States v. Gill, 513 F.3d 836, 846 (8th Cir. 2008).  Because there is no consensus that polygraph evidence is reliable, its probative value is minimal, id., and the danger of unfair prejudice is high.  See United States v. Waters, 194 F.3d 926, 930 (8th Cir. 1999) (affirming exclusion of polygraph evidence on Rule 403 grounds).

Oslund opted against testifying at trial, which is his right. In doing so, he knowingly forfeited a chance to afford the jury an opportunity to judge his credibility. Even assuming a polygraph examination suggested no deception, this would not be a reason to reopen the record to develop evidence which would not be admissible at trial.

No evidentiary hearing is required.

C. <u>Jurisdictional Argument Foreclosed and Meritless</u>

Oslund seeks a "court interpretation" of 18 U.S.C. § 924(j)(1), under which he was convicted of murder by firearm. Section 924(j) refers to a "murder (as defined in section 1111)." The actual definition of murder is found at subsection (a); § 1111(b) sets forth penalties and a jurisdictional requirement.

In a strained reading, Oslund suggests Section 924(j) incorporates not only the definition of murder from § 1111(a), but also § 1111(b)'s jurisdictional requirement. He claims the government had to prove the murder occurred within "the special maritime and territorial jurisdiction of the United States." This argument is foreclosed, however, because it could have been raised on direct appeal. <u>United States v. Samuelson</u>, 722 F.2d 425, 427 (8th Cir. 1983).

But even if the Court considered it, the argument fails. The Eighth Circuit has yet to consider whether Section 924(j) incorporates the jurisdictional requirement of § 1111(b). However,

13

its sister Circuits have persuasively rejected this contention on two grounds.  First, § 924(j)'s plain language clearly incorporates only the definition of murder found at § 1111(a).  See United States v. Young, 248 F.3d 260, 274-75 (4th Cir. 2001).  Second, the plain language also makes clear that Section 924(j) applies to "a person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm."  18 U.S.C. § 924(j).  Thus, a violation of Section 924(c) is a predicate offense - and Section 924(c) has its own jurisdictional requirement.  Section 924(j) incorporates the jurisdictional requirement from Section 924(c).  Young, 248 F.3d at 275; see also United States v. Nguyen, 155 F.3d 1219, 1227 (10th Cir. 1998).  Because the Court of Appeals, on direct appeal, found the government's evidence was sufficient to sustain Oslund's conviction, his requested interpretation provides no ground for § 2255 relief.

      D.   Certificate of Appealability

      The Court has considered whether it is appropriate to issue a Certificate of Appealability ("COA").  See Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997).  The Court finds no issue in this petition is "debatable among reasonable jurists."  Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir. 1994) (citing Lozada v. Deeds, 498 U.S. 430, 432 (1991)).  Petitioner has, therefore, failed to make the "substantial showing of the denial of a constitutional right" necessary for the issuance of a COA.  28 U.S.C. § 2253(c)(2).

III.  Conclusion

     For the foregoing reasons, IT IS ORDERED that:

     1.   Petitioner's motion to vacate, set aside, or correct his

          sentence pursuant to 28 U.S.C. § 2255 [Docket No. 148] is

          denied.

     2.   Petitioner's motion for an extension of time [Docket No.

          150] is granted.

     3.   No certificate of appealability shall issue.

Dated:  July 22, 2008


                              s/ JAMES M. ROSENBAUM
                              JAMES M. ROSENBAUM
                              United States District Judge

15